## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                    **Criminal File No.: 11-CR-129 DWF/SER**

        Plaintiff,

v.                                            **REPORT AND RECOMMENDATION**

Derek Lee Preston,

        Defendant.

_____

    Andrew S. Dunne, Surya Saxena, Esqs., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff.

    Robert D. Sicoli, Esq., Law Offices of Robert D. Sicoli, Ltd., 8000 Flour Exchange Building, 310 Fourth Avenue South, Minneapolis, Minnesota 55415, for Defendant.

_____

STEVEN E. RAU, United States Magistrate Judge

    The above captioned case comes before the undersigned United States Magistrate Judge on Defendant's Motion to Dismiss for Speedy Trial Act Violation [Doc. No. 16] and Defendant's Motion to Suppress [Doc. No. 23].[1] This matter has been referred to the undersigned for the resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and District of Minnesota Local Rule 72.1.

## I. BACKGROUND

    On March 2, 2011, Defendant Derek Lee Preston ("Preston") was charged with possessing a firearm in violation of 18 U.S.C. § 922(g)(1) [Doc. No. 1]. Preston has seven prior felony convictions, including possession of a controlled substance, domestic assault, terroristic threats, unlawful possession of a firearm, and attempted aggravated robbery. The Court held a pre-trial

_____

[1] The non-dispositive pretrial motions [18, 20, 22, and 25] are addressed in a separate Order.

motions hearing on May 16, 2011.  Minneapolis Police Officers George Judkins and Tyrone D. Barze, Jr. testified on behalf of the Government.  Bureau of Alcohol, Tobacco, and Firearms and Explosives ("ATF") Agent and Minneapolis Police Sergeant Gregory J. Freeman also testified on behalf of the Government.  The Court received five exhibits into evidence: Def.'s Ex. 1, Preliminary Detention Hearing Minutes (3/11/11); Def.'s Ex. 2, MPD Squad Video; Gov't Ex. 1, MPD Squad Video; Gov't Ex. 2, Scales Interview Video and transcript (1/26/11); and Gov't Ex. 3, Scales Interview Video and transcript (1/27/11).

Both parties submitted letters to these chambers and to Judge Donovan W. Frank's chambers on May 10, 2011, regarding the timing of oral argument on Preston's Motion to Dismiss.  The Court issued an order on May 13, 2011, stating that the Court would hear oral argument on Preston's Motion to Dismiss for Speedy Trial Act Violation along with the Parties' pretrial motions [Doc. No. 35].  The Court heard oral argument on the Motion to Dismiss on May 16, 2011.

The Court required Preston to file his post-hearing briefs by May 25, 2011 and the Government to file its post-hearing briefs by June 1, 2011; both sets of briefs were timely [Doc. No. 36].  The Court took the matter under advisement as of June 1, 2011, upon receiving the Government's post-hearing briefs.  This matter is set for trial before United States District Judge Donovan W. Frank on June 20, 2011.

## II.  FACTS

The following facts were elicited from the testimony and exhibits introduced at the hearing.[2]  Officer George Judkins ("Officer Judkins") has worked for the Minneapolis Police Department as a Patrol Officer and 911 Responder in the Second Precinct for nearly fifteen years.

---

[2] The page references cited herein are found in the Transcript of the Motions Hearing, *United States v. Preston*, (11CR129), May 16, 2011 [Doc. No. 40] ("Tr.").

Officer Tyrone D. Barze, Jr. ("Officer Barze") is also a Patrol Officer in the Second Precinct of the Minneapolis Police Department.  He has been a Police Officer for two years and three months. Officers Barze and Judkins have worked on the same shift in the Second Precinct for approximately one year and three months.  Sergeant Gregory J. Freeman of the Minneapolis Police Department ("Agent Freeman") is a cross-deputized federal agent investigating weapons charges with the Minneapolis ATF Task Force.

### A.  January 25, 2011

At approximately 10:20 p.m. on January 25, 2011, Officer Judkins was driving alone westbound on 35th Avenue Northeast in Minneapolis in a marked squad car.  At the intersection of 35th Avenue Northeast and Tyler Street, he saw a Ford Explorer ("Explorer") at the North end of the intersection attempting to back-up and make a U-turn.  The Explorer hit a snow bank in its attempt to make a right U-turn with its left turn signal on.  The vehicle then backed out and attempted to come around the corner.  This maneuver caused the back end of the vehicle to obstruct the intersection.  The Explorer went through a stop sign in reverse with its left turn signal still activated.  Officer Judkins stopped his patrol car because the Explorer was blocking the intersection.

The Explorer straightened out and turned right.  Officer Judkins followed the vehicle, which proceeded up Tyler Street from 35th Avenue.  The Explorer pulled over onto the right shoulder voluntarily and without signaling.  Officer Judkins pulled behind the Explorer at a safe distance and ran the license plate number to obtain the vehicle's registration information and to determine if the vehicle was stolen.  His search revealed that the Explorer's title was listed to a car lot on Lake Street in Minneapolis, Minnesota.

A woman, later identified as Sherry Smith (aka Nicky) ("Smith"),[3] exited the parked Explorer from the front passenger side and walked up the sidewalk.  Smith turned, looked back at Officer Judkins, and continued walking northbound on Tyler Street.  Smith walked past several homes and knocked on the door of a house that did not have any cars parked in front of it.  Judkins found this behavior "odd" and "suspicious."  (Tr. 35).   The occupants of the house were looking at Smith from inside the front window but did not answer the door.  Smith continued to glance back Judkins.  Based on his experience as a patrol officer, Smith's actions seemed "like a distraction."  (Tr. 35-36).  Several minutes later, Smith walked away from the house and back to the Explorer.

Officer Judkins activated the lights and video recording equipment on his squad car.  (Def.'s Ex. 2).[4]  He got out of his vehicle and walked over to the driver's side of the Explorer.  When he reached the driver's side window, he observed the driver, Smith, and two other passengers in the car.  Judkins asked the driver, later identified as Charles Tate ("Tate"), if he had a license.  Tate said he did not have a license.  (Tr. 37).  Tate also told Judkins that they were looking for Tate's sister who lived in the vicinity of 35th Avenue and Central Avenue.  Tate said that his sister was involved in a domestic dispute with her boyfriend.[5]

Officer Judkins shined his flashlight at the front of the vehicle to search for a vehicle identification number ("VIN").  At that point, Officer Judkins could see Preston in the rear of the vehicle but did not identify him immediately or observe his demeanor.  Officer Judkins testified

---

[3] In his January 27, 2011 interview with Agent Freeman, Preston explained that Sherry Smith, also known as "Nicky," was Charles Tate's girlfriend.  (Gov't Ex. 3).

[4] Based on Officer Judkins hearing testimony, the time on the video recording at approximately 11:00 p.m., was not accurate.  According to Judkins, the time on the video recording device in squad cars is almost always inaccurate. (Tr. 47-48).

[5] In a January 26, 2011 interview with Agent Freeman, Preston explained that he and the other occupants of the Explorer were their way to Tate's sister's house because the sister "got into it" with her boyfriend.  (Gov't Ex. 2, at 29).

that the passengers "looked too nervous for me," had "nervous faces," and did not make much eye contact. [6] (Tr. 38). Officer Judkins then called for back-up on his personal radio based on the "unusual" circumstances he observed. *Id.* Judkins "almost never" called for back-up. (Tr. 38). Based on the suspicious activity he witnessed, Officer Judkins testified, "I was nervous for my safety." *Id.*

Smith told Judkins that she purchased the Explorer five or six days earlier.[7] Initially, Smith said she had insurance but was unable to provide proof of insurance. Officer Judkins asked Smith to locate a purchase agreement. Smith fumbled around in the glove box and produced paperwork showing that she purchased the Explorer on January 19, 2011. Smith told Officer Judkins that she did not pick-up the vehicle until that evening, because of a financial issue involving the down payment.

Officer Judkins then opened the rear door on the driver's side and saw a woman later identified as Latice sitting on the left side.[8] He also saw a man seated in the back seat to the right of Latice. Officer Judkins asked both back seat passengers if they had identification; he was unsure whether Latice was an adult. When Officer Judkins asked Latice how old she was, she said she was 20 years old. Latice did not have identification but provided her date of birth.

During Officer Judkins' conversation with Latice, Preston handed Judkins his Minnesota identification card. Officer Judkins testified that Preston "had a familiar face and I was trying to figure out where I knew him from." (Tr. 41). Judkins said, "As soon as I saw the name on the ID,

---

[6] Significantly, Officer Judkins' written report did not mention whether the occupants of the vehicle were acting nervous. (Tr. 52-53). In total, Judkins was in close contact with Preston for approximately one to two minutes. Judkins acknowledged that including information as to a suspect's demeanor in a police report is important. *Id.*

[7] Officer Judkins initially stated that he thought one of the occupants of the car told him that the car was purchased at 5:30 p.m. the same evening. (Tr. 55-56).

[8] In a January 26, 2011 interview, Preston told Agent Freeman that the female seated in the back seat of the Ford Explorer during the January 25, 2011 traffic incident was Preston's girlfriend, Latice. (Gov't Ex. 2).

I remembered who he was." (Tr. 42). Judkins became aware of Preston's history of gun possession through roll call briefings on officer safety and conversations with his partner. (Tr. 42). Officers also learned information like this through the review of police reports and attendance of sergeant-led briefings.

Officer Judkins testified that Preston's name "went around quite a bit as far as officer safety information." (Tr. 80). Based on his knowledge of Preston's history, Officer Judkins was concerned that Preston might possess a weapon. In the interest of safety, Judkins returned to his squad car and waited for back-up to arrive. *Id.*

Upon returning to his squad car, Officer Judkins ran the names of the occupants of the Explorer though a computerized system that allows an officer to check an individual's driver's license status, driving history, vehicle ownership, warrant status, law enforcement alerts, and Computer Assisted Police Records System ("CAPRS") reports. The system, however, cannot perform criminal history checks. While Judkins was in the process of running searches on the driver and passengers, he informed the back-up officers via radio communication that Preston "had a history of gun possession" and was seated in the rear passenger seat of the Explorer. (Tr. 42-43). Judkins was not aware of Preston's prior felony convictions at that time. (Tr. 73).

Officer Judkins also thought it was possible that Preston had a warrant out for his arrest. Officer Judkins testified that Preston had "a long history in our precinct, mainly violence or guns." (Tr. 44).[9] At that time of the stop, Officer Judkins knew that Preston's girlfriend had an Order for

---

[9] Officer Judkins' supplemental police report listed three domestic incidents as the basis for his safety concerns regarding Preston. These concerns led to the search of Preston on January 25, 2011. Each of these incidents was memorialized in a separate police report.

The first report (04-301145) and second report (04-04-316861) were domestic abuse cases. Officer Judkins was not directly involved with either of the 2004 incidents. His memory of these incidents was based on conversations with the officers that responded to the incidents, such as Officer Neil, whose locker was located next to Officer Judkins' locker at the Second Precinct.

Protection ("OFP") against him.   While seated in his squad car, Judkins remarked, "I hope [Preston] has a warrant" because he could have also conducted a search incident to arrest.  (Def.'s Ex. 2).  Because of Preston's history of domestic violence and weapons issues, Judkins sought to get Preston "off the street for the night."  (Tr. 44).  Officer Judkins' search on his squad car laptop revealed that there were no outstanding warrants for any of the individuals in the Explorer.

Officer Barze, Barze's partner, and two other officers responded to Officer Judkins' call for back-up.  Officer Judkins informed the other officers that Preston had a history of weapons charges and was seated in the rear passenger side seat of the Explorer.[10]  Officer Judkins informed the officers of Preston's location because "it's standard officer safety" and alerting other officers to potential danger is one of Judkins' key responsibilities as a Patrol Officer.  (Tr. 44).  Judkins testified that, "I don't want somebody walking around who may have a gun on them, especially when I have to check them."  *Id.*   The record is unclear as to whether the officers at the scene had their handguns drawn.[11]

---

Though Preston allegedly had a gun in both 2004 cases, no gun was ever found.  Charges were not filed in conjunction with either incident.

The third incident, 08-015288, occurred in 2008, exactly three years before the January 25, 2011 traffic stop described herein.  Officer Judkins was not directly involved in responding to this incident.  Rather, Judkins' partner, Officer Greer, responded to a domestic disturbance call from Preston's girlfriend.   Preston's girlfriend alleged that she and Preston were fighting.  Approximately an hour and a half later, Preston's girlfriend called the police to tell them that Preston was in possession of a gun.  No gun was ever found, but Preston was arrested on domestic assault charges.  The Court is unclear as to Charles Tate's involvement in the 2008 incident.

[10] Officer Barze, however, testified that he was unaware as to which of the four passengers in the Explorer was suspected of possessing a firearm.  He was also not aware of whether the other officers, aside from Officer Judkins, knew that Preston was suspected of possessing a weapon.

[11] Officer Barze testified that, "I remember seeing a few officers with their handguns in their hands."  (Tr. 100).  Barze also stated that he had his weapon drawn from its holster out to his side, but he was not pointing it at anyone.  (Tr. 113).  This behavior indicated to Officer Barze that the officers were "worried about something that pertains to the vehicle." *Id.*  The squad video of this incident, however, did not show any officers with weapons drawn, though the squad video did not capture the officers who were located behind Officer Judkins' squad car.  (Def.'s Ex. 2).

The five officers at the scene surrounded the Explorer with safety as a primary concern. The Explorer had to be impounded because no one could lawfully operate it, and the vehicle could not be parked lawfully on the city street without valid insurance.  Conducting an inventory search of a vehicle before it is impounded is standard police department practice.  An impound search requires all occupants to exit the vehicle.  (Def.'s Ex. 2).

Officer Judkins wanted to "keep an eye on everybody's hands" and "get Mr. Preston out of the back seat as soon as possible."  (Tr. 45).  Officer Judkins asked Tate, the driver of the vehicle, to exit first.  He told Tate that Preston had a history of violence and that he was concerned about Preston having a gun.  Tate said he was not aware of Preston's history.

Officer Barze, who conducted the pat-down of Preston, did not recall whether the other officers pulled Preston out of the vehicle or whether Preston exited the vehicle himself.[12]  Two officers were standing between Officer Barze and the vehicle.  Preston was dressed in all black when he exited the vehicle and walked toward Officer Barze.[13]  One of the other officers ushered Preston toward Officer Barze.  Officer Barze made the decision to search Preston because the last

---

[12] The Court carefully reviewed the squad car video and cannot determine definitively whether Preston exited the car himself or was touched as he exited the car because a snow bank obstructed the view of the passenger side of the vehicle. (Def.'s Ex. 2).  The video does show, however, that the officer positioned in front of Officer Barze stepped away from the rear passenger door to allow Preston to exit.  Thus, any implication that Preston was forcibly removed is an overstatement of the facts.  Yet, contrary to the Government's assertion, the squad video does not "clearly" show that Preston exited the vehicle on his own.  [Doc. No. 43, at 7].  In fact, the video shows that Preston was ushered along the back of the car towards Officer Barze for a pat-down. Therefore, the Government's statement that Preston exited the vehicle "without any officer touching him" is also not entirely correct.  *Id.*

[13] At oral argument, Officer Barze identified Preston as the same individual he observed dressed in black emerging from the rear passenger seat of the Ford Explorer on January 25, 2011. Officer Barze testified that he did not recall whether Preston approached the officers or whether another officer ushered Preston towards Barze for a pat frisk.  A review of the squad video shows that another officer ushered Preston towards Barze.  (Def.'s Ex. 2).

officer standing in a line typically conducts a pat-down while the other officers secure the vehicle.[14]

Officer Barze told Preston to put his hands behind his head and interlocked his fingers. Barze gave this instruction to Preston based on his academy training and out of concern for his safety. Requiring an individual to place his hands on his head allows the officer some distance from the individual's mid-section where weapons are often carried.

Officer Barze then walked Preston away from the Explorer and over to Barze's squad car to pat-down Preston.[15] For safety reasons, Officer Barze also wanted to distance himself from the other officers. Next, Officer Barze handcuffed Preston; he did this prior to conducting a pat-down because the handcuffs allowed him to control the situation and disable Preston's hands in the event that he had a weapon.

Officer Barze began the pat-down on Preston's right side. On the right side of Preston's outer garment, he felt a hard cylinder. Officer Barze immediately recognized this object as a firearm and he determined that it was located in an inner pocket of Preston's jacket.

Officer Barze asked Preston if he knew what the item was. (Tr. 103). Officer Barze asked this question because he wanted to determine whether Preston would dispute the jacket's ownership. Preston claimed that he had a permit from Fridley to purchase the firearm. (Tr. 104). He unzipped the pocket of Preston's jacket and removed a Harrington and Richardson Young American .32 caliber revolver.

---

[14] Before the firearm was discovered, the officers could have released Preston along with the other individuals in the Explorer if he did not find any drugs, guns, or other contraband. At the time of the initial stop, Preston was not driving the vehicle unlawfully and did not show any other signs of apparent criminal liability. Officers, however, did not want to allow Preston to leave the scene because they had not yet determined whether Preston was in possession of a gun. They were unsure as to what they might ultimately find.

[15] Because Officer Barze conducted the search further behind Judkins' squad car, the search was not captured on the squad car video. (Def.'s Ex. 2).

Officer Barze examined the loaded revolver.  He removed the cylinder from the gun's frame and took out the ammunition.  Officer Barze placed all of the revolver components in his squad car.

Officer Barze questioned Preston's assertion about the permit to purchase because he knew under Minnesota law that an individual carrying a concealed weapon must have a permit to do so.  Permits to carry firearms are distinct from permits to purchase.  Preston was detained after the gun's discovery.

Prior to searching Preston's left side, Preston told Officer Barze, without any prompting, that he should check the pocket on Preston's left side.  (Tr. 105-06).  During the pat-down of Preston's left side, Officer Barze felt objects in the inner pocket of Preston's outer garment that he suspected to be drugs or drug paraphernalia.  He reached into the inner pocket of Preston's outer garment and found marijuana, crack rocks, and a crack pipe.[16]  Upon discovering these items, Officer Barze placed Preston under arrest.

Officer Barze discussed the findings of his pat-down with the other officers at the scene. (Tr. 106).  Based on his discussions with the other officers regarding "who Mr. Preston was and the history that Officer Judkins had with him," Barze determined that Preston could not legally carry a firearm. (Tr. 107).

Officer Barze returned to his squad car and contacted "Base 600," which is a Minneapolis Police Department's call center that provides strategic information.  He wanted to ascertain whether Preston was on probation or had any restrictions preventing him from carrying a firearm.

---

[16] During the January 27, 2011 interview Agent Freeman informed Preston that he was being charged with narcotics possession in the third degree and felony firearm possession by a prohibited person.  The federal indictment contains one charge (Felon in Possession of a Firearm) [Doc. No. 11].  At this time, the Court is not aware as to whether Preston faces state charges for narcotics possession.

Base 600 advised Officer Barze that Preston was on probation for a domestic assault charge.  (Tr. 107).

The driver, Tate, and the owner of the car, Smith, were issued misdemeanor violations for driving without a valid license and driving without insurance.[17]  Officer Judkins released Tate and Smith.  Preston was taken into custody and booked at the Hennepin County Jail.

### B.  January 26, 2011

Agent Freeman interviewed Preston on January 26, 2011 and January 27, 2011.  He learned of Preston's arrest through the CAPRS, which is the Minneapolis police computer system that routes cases to the appropriate investigative unit, which in this case was the ATF Task Force.

On January 26, 2011, Agent Freeman conducted a Scales interview of Preston in the Hennepin County Jail.[18]  The interview occurred in a small room that was approximately 10 feet by 10 feet or 8 feet by 10 feet.  The room had a bare cinder block front, bare table, and hard-backed chairs.  Agent Freeman was not armed during the interview.  Preston was not handcuffed or restrained in any way.

Agent Freeman commenced the interview by identifying Preston based on his photographic Hennepin County Jail identification bracelet.  Using a *Miranda* card, Agent Preston read Preston his *Miranda* rights individually.  He asked Preston to recite his understanding of these rights.  Preston confirmed that he understood each right as it was read.  Preston did not say that he was unwilling to speak with Agent Freeman about his arrest.  Preston also did not request to speak to an attorney even though he acknowledged his right to counsel.

---

[17] These charges were commensurate with the penalties allowable under state and local law for operating a vehicle without a license or insurance.

[18] In the Minneapolis Police Department, a "Scales Interview" is a recorded custodial interview.  *See* http://www.ci.minneapolis.mn.us/mpdpolicy/8-100/8-100.asp (last accessed June 7, 2011).

Immediately after Agent Freeman finished reading Preston his *Miranda* rights, Preston began speaking with Agent Freeman about his arrest. Preston did not appear afraid and he spoke in a friendly manner. Preston, however, expressed concerned about the possibility of going to jail and at times became emotional about the prospect of having to go back to jail.

In the course of the interview, Preston made several incriminating statements regarding the possession of a firearm and narcotics. During the interview, Preston did not dispute that he knowingly possessed a firearm at the time of the January 25, 2011, traffic stop.

### C.  January 27, 2011

Agent Freeman interviewed Preston for a second time on the morning of January 27, 2011. The interview occurred in a room similar to the interview room of January 26, 2011. Freeman was not armed and Preston was not restrained in any way. Preston was allowed to enter the room under his own control.

The Court was provided with transcripts and audio recordings of both the January 26, 2011 and January 27, 2011 interviews. The transcript for the January 27, 2011 interview states: "Q [Agent Freeman]: All right. Ah, just a couple of things to clean up from yesterday, um, I didn't mirandize you so that we can talk." (Gov't Ex. 3 at 1). Upon a careful review of the audio recording, the Court is unsure as to whether the transcript accurately reflects Agent Freeman's statement. Based on the recording, Agent Freeman seems to have said, ". . . we need to re-*Mirandize* you so that we can talk" or "I need to *Mirandize* you so that we can talk." The latter two interpretations are consistent with the fact that no dispute exists that Preston was *Mirandized* on January 26, 2011.

On January 27, 2011, Freeman again read Preston his *Miranda* rights individually. Portions of the audio recording of Preston's response to each *Miranda* right are inaudible. The

recording reflects, however, that Preston did not answer in the negative or ask any questions regarding any of the *Miranda* rights Agent Freeman recited.

Preston spoke with Agent Freeman voluntarily and did not ask for an attorney at any time. During the interview, Preston self-administered a buccal swab to provide Agent Freeman with a DNA sample.  Preston did not object to the taking of the sample, nor did he ask to stop the interview.

Preston made many incriminating statements or admissions during the interview related to possession of a firearm and narcotics on January 25, 2011.  Preston provided additional details about his relationship with the other Explorer passengers and where they were going on the evening of January 25, 2011.  Agent Freeman and Preston also discussed the charges that would be filed against Preston and the process for setting up a proffer.  Agent Freeman did not make any promises or agreements with Preston during the interview.  Rather, Freeman encouraged Preston to discuss legal options with his attorney.

## III. PROCEDURAL HISTORY

On March 3, 2011, the Government filed a one-count complaint against Preston for possession of a firearm in violation of 18 U.S.C. § 922(g)(1), which prohibits convicted felons from possessing firearms.  On March 4, 2011, Magistrate Judge Arthur J. Boylan issued a bench warrant charging Preston with violating 18 U.S.C. § 922(g)(1).  On that same day, Preston was taken into federal custody and made an initial appearance before Magistrate Judge Franklin L. Noel, who ordered Preston temporarily detained.[19]

On March 8, 2011, Magistrate Judge Janie S. Mayeron granted Preston's request for a continuance to allow for a pretrial services interview.  Three days later on March 11, 2011, Magistrate Judge Mayeron conducted a detention hearing.  At the hearing, the Government moved

---

[19] Preston was in state custody between January 25, 2011 and March 3, 2011.

for Preston's detention.  Preston waived argument as to detention based on the parole violation issues on state charges in Hennepin County.  [Doc. No. 9 at 2].  Magistrate Judge Mayeron orally ordered that Preston be detained.  (Def.'s Ex. 1).  The hearing minutes contained a checked box stating "Deft Ordered Detained – Govt to submit proposed order."  *Id*.  Ten days later, on March 21, 2011, Magistrate Judge Mayeron issued a Detention Order Pursuant to 18 U.S.C. § 3142(e) [Doc. No. 9].  Magistrate Judge Mayeron's Detention Order included several additional conditions beyond those contained in her oral order including the requirement that Preston be kept separate from other persons awaiting trial and that Preston be permitted to consult privately with his attorney.  *Id*. at 3, ¶ 2-¶ 3.

On April 12, 2011, Preston was indicted.  This Court arraigned Preston on April 20, 2011, and Preston entered a not guilty plea.

On May 2, 2011, Preston filed a Motion to Dismiss for Speedy Trial Act Violation [Doc. No. 16] along with four other pretrial motions including a Motion to Suppress [Doc. No. 23].  On May 5, 2011, Preston filed a *pro se* Motion to Dismiss for Ineffective Assistance of Counsel, which he later withdrew [Doc. No. 37].

## IV.   DISCUSSION

### A.  Defendant Preston's Motion to Dismiss for Violation of the Speedy Trial Act ("STA"), 18 U.S.C. § 3161(b) Should be Denied.

#### 1.  No STA Violation Occurred.

The Government must file an indictment "within thirty days from the date on which [an] individual was arrested."  18 U.S.C. § 3161(b).  Thirty-one (31) days passed between the date upon which Preston was ordered detained (March 11, 2011) and the date upon which Preston was indicted (April 12, 2011).  Preston contends that this resulted in a one day violation of the thirty-day period that 18 U.S.C. § 3161(b) dictates and therefore his Motion to Dismiss should be

14

granted.  The Government asserts that there was no STA violation because the time between its

motion for detention (March 11, 2011) and the issuance of the written detention order (March 21,

2011) should be excluded under the STA.   This Court must determine whether the nine days

between Magistrate Judge Mayeron's oral detention order and the date upon which the written

order was filed should be excluded under the STA.

The thirty day period calculable under § 3161(b) does not, however, include any "delay

reasonably attributable to any period, not to exceed thirty days, during which any proceeding

concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1)(J);

see United States v. Moses, 15 F.3d 774, 776-77 (8th Cir. 1994).  A pretrial motion for detention is

considered an excludable motion under 18 U.S.C. § 3161(h) though not enumerated in Fed. R.

Crim. P. 12(b)(2).  Id. at 777 (explaining that the Eighth Circuit previously rejected the argument

that excludable pretrial motions were limited to those enumerated in Fed. R. Crim. P. 12(b)(2)).

Failure to indict within 30 days of arrest or appearance results in the charges being dismissed or

dropped, but the time limit is extended by various exclusions listed in § 3161(h).  See 18 U.S.C. §

3162(a)(1); see also United States v. Walker, 255 F.3d 540, 542 (D. Minn. 2001) (explaining STA

"explicitly authorizes dismissal as a sanction" for violation of § 3162(b) for failure to file a timely

indictment or information).

The case law on whether the time between the oral granting of the Government's motion

for detention and the written detention order should be excluded under 18 U.S.C. § 3161(h)(1)(J)

is sparse.  The Court is aware of only one STA case in this District where the Court ruled on

whether to exclude the time between the oral detention order and the written detention order.

United States v. Leon, No. 97-124, 2008 WL 3906762, at *2 (D. Minn. Aug. 25, 2008); see also

United States v. Williams, No. 06-143, 2007 WL 1964359, at *2 (D. Minn. Jul. 2, 2007) (citing

*Moses* for the proposition that "[t]he thirty day period [under § 3162(b)] does not include any days during which a motion for detention is pending").[20]

In *Leon*, Judge Rosenbaum excluded the time between the filing of the detention motion and the filing of the written order eight days later for a total of twelve excluded STA calendar days. *Id*. at *2. Preston contends, however, that this portion of *Leon* was *dicta* because the four days between the filing of the motion for detention and the detention hearing were indisputably excludable from the STA under *United States v. Moses*, 15 F.3d 774, 776-77 (8th Cir. 1994).[21] Nonetheless, in *Leon*, the Court explicitly excluded eight days between the oral granting of the motion for detention and the written order from the STA. *Leon* applies in this case.

Here, Preston was taken into federal custody on March 4, 2011. He was arrested and charged in federal court via Complaint on March 4, 2011. Magistrate Judge Mayeron orally ordered Preston detained on March 11, 2011. Magistrate Judge Mayeron issued an Order of Detention on March 21, 2011. Significantly, in both the instant case [Doc. No. 9] and in *Leon*, [No. 97-CR-124, Doc. No. 9], the detention hearing minutes clearly reflect that the presiding judge ordered the defendant detained. *Leon*, therefore allows for the exclusion of the nine days between the oral granting of the Government's motion for detention and the written detention order from the STA. 2008 WL 3906762, at *2. Thus, based on *Leon*, no STA violation occurred in this case. *Id*.

Additional support for excluding the time between the oral granting of the Government's motion for detention and the issuance of a written detention order is found in 18 U.S.C. § 3142(i). Under 18 U.S.C. § 3142(i), the Court is required to issue a separate written detention order when

---

[20] *Williams* does not explicitly determine whether the motion for detention was under advisement during the time between the oral granting of the motion for detention and the issuance of the written order. 2007 WL 1964359, at *2.

[21] Though *Leon* was before the Court on a Petition for Habeas Corpus, the STA portion of the analysis remains highly relevant and illustrative to the instant case.

the Court detains an individual under § 3142(e) based on the language "the judicial officer shall."

*Id*.  Specifically, the statute requires the Court to:

(1) include written findings of fact and a written statements of reasons for the detention;
(2) direct the person to be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;
(3) direct that the person be afforded reasonable opportunity for private consultation with counsel.

18 U.S.C. § 3142(i).

Based on § 3142(i), the mere oral granting of detention is insufficient to satisfy 18 U.S.C. § 3142(e).  It logically follows that a motion for detention is "under advisement by the court" pursuant to 18 U.S.C. § 3161(h)(1)(J) until the issuance of a written order that satisfies 18 U.S.C. § 3142(i).  Thus, the time between the oral granting of a motion to detain and the issuance of a written detention order should be excluded under 18 U.S.C. § 3161(h)(1)(J).  As a matter of course, several District Courts in the Eighth Circuit and elsewhere expressly exclude from the STA calendar the time between the filing of the motion for detention and the issuance in the text of the written detention order.  *See United States v. Schrock*, No. 08-358, 2008 WL 4772232, at *4 (N.D. Iowa Oct. 28, 2008); *United States v. Birbragher*, No. 07-1023, 2007 U.S. Dist. Lexis 90353, at *24 (N.D. Iowa Dec. 7, 2007); *see also United States v. Winbush*, 349 F. Supp. 2d 126, 127 (D. Mass. Dec. 6, 2004).

In this case, Magistrate Judge Mayeron detained Preston under 18 U.S.C. § 3142(e).  [Doc. No. 9, at 2].  Pursuant to 18 U.S.C. § 3142(i), the Court must issue a written detention order.  The Court issued the detention order nine days after the detention hearing and 21 days before Preston was indicted.  *Leon* requires the Court to exclude the nine days between March 11, 2011 and March 21, 2011 from the STA calendar.  Thus, in this case, no STA violation occurred because the

indictment was filed less than 30 days after the detention order was issued. *See* 18 U.S.C. § 3161(b); *Leon*, 2008 WL 3906762, at *2.

## 2. STA Prejudice Analysis, 18 U.S.C. § 3162.

Preston alleges that the charges against him should be dismissed with prejudice because he was in state custody for five weeks before he was transferred to federal custody and eleven weeks before he was indicted on federal charges. Though the Court finds that no STA violation occurred, other courts encountering STA violation issues have analyzed prejudice under 18 U.S.C. § 3162 in light of the Sixth Amendment issues inherent to the STA. *See United States v. Mahan*, 492 F. Supp. 2d 822, 827-28 (S.D. Ohio Feb. 2, 2006).

Contrary to Preston's assertions at oral argument, his time in state custody does not count towards his federal STA calendar days. "It is an 'undisputed rule that a state arrest does not trigger the Speedy Trial Act's clock, even if the arrest is for conduct that is the basis of a subsequent indictment for a federal offense.'" *United States v. Beede*, 974 F.2d 948, 950-51 (8th Cir. 1992) (quoting *United States v. Mills*, 964 F.2d 1186, 1189-90 (D.C. Cir. 1992)). "An arrest on state criminal charges is not turned into a federal arrest merely because the arrest is a product of a joint state-federal investigation or because federal officers participate in the arrest." *Id.* (internal citation omitted); *see United States v. Blackhom*, 874 F.2d 378, 381 (6th Cir. 1989) ("[r]egardless of the degree of federal involvement in a state investigation and arrest, only a federal arrest initiates the running of the time established by [§ 3162(b)]"). Thus, the Court will only consider the 39 days between the date upon which Preston was taken into federal custody (March 3, 2011) and the date upon which he was indicted (April 12, 2011) for purposes of analyzing prejudice under 18 U.S.C. § 3162.

The STA provides several prejudice factors that a court must assess. The STA requires Courts to consider the following factors: "[t]he seriousness of the offense; the facts and

circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice." 18 U.S.C. § 3162(a)(1). Unlawful possession of a firearm by a felon has long been considered a "serious" offense because of the inherent danger to the community. *United States v. El-Alamin*, No. 06-173(1), 2007 WL 951599, at *2 (D. Minn. Mar. 29, 2007). At most, a one day STA violation occurred and therefore the prejudice to Preston is slight at best. Given that Preston violated his parole in Hennepin County, and Preston would not have been released from custody regardless of whether the Motion to Dismiss was granted, Preston was minimally affected by the fact that 31 days passed between the detention hearing and the filing of the indictment. Significantly, if the federal felon in possession of a firearm charge were to be dismissed, Preston could still be subject to prosecution on state narcotics charges. The Court recommends that Preston's Motion to Dismiss be denied based on the valid 18 U.S.C. § 3161(h)(1)(J) exclusion and the lack of prejudice to Preston.

**B. Defendant Preston's Motion to Suppress Should be Denied.**

Preston moves to suppress the firearm Officer Barze recovered from his person in the pat-down, arguing that this search and seizure violated Preston's Fourth Amendment rights. Specifically, Preston argues that law enforcement lacked reasonable suspicion to search him based solely on his reputation because he was not engaging in suspicious behavior. The Court disagrees and will analyze each phase of the January 25, 2011, traffic stop to determine whether law enforcement had reasonable suspicion that Preston was in possession of a firearm in the totality of the circumstances and in light of clearly articulated officer safety concerns.

**1. Motion to Suppress Firearm**

The constitutionality of the traffic stop and impound search that led to the discovery of Preston's loaded weapon on his person is governed by *Terry v. Ohio* and its progeny. 392 U.S. 1, 26-27 (1968). An investigatory detention or *Terry* stop is a narrow exception to the Fourth

Amendment's probable cause requirement.  *Id.*  In *Terry*, the Supreme Court held that a police officer may stop and briefly question a person who is reasonably suspected of criminal activity. *Id.* at 22-24.  The officer must have a reasonable, articulable suspicion of criminal activity to conduct the investigatory detention.  *Id.* at 21-22.  A reasonable, articulable suspicion is a particularized and objective basis for suspecting the person stopped of criminal activity.  *United States v. Walker,* 555 F.3d 716, 719 (8th Cir. 2009).  The officer must be able to point to specific and articulable facts and rational inferences drawn from those facts, reasonably suggesting that criminal activity has occurred or is imminent.  *Terry*, 392 U.S. at 21.

The test is objective.  *United States v. Horton*, 611 F.3d 936, 941 (8th Cir. 2010). Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in the totality of the circumstances.  *United States v. Maltais*, 403 F.3d 550, 554 (8th Cir. 2005).

### a.   Officer Judkins Had Sufficient Reasonable Suspicion to Conduct the Traffic Stop.

"[S]o long as police have probable cause to believe that a traffic violation has occurred, the stop is valid. . . ." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996).  Stopping a vehicle after observing an illegal turn or a driver's failure to signal is "objectively justified." *United States v. Stachowiak*, 521 F.3d 852, 853-55 (8th Cir. 2008) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).  A vehicle stop is considered a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  After a vehicle is stopped, an officer is "entitled to conduct an investigation reasonably related in scope to the circumstances that prompted it." *United States v. Collier*, No. 10-3144, 2011 WL 2150223, *4 (8th Cir. 2011) (citing *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010)).  "The officer also has the authority to inquire into the driver's destination, check the driver's license and registration, or to request that the driver

20

step out of the vehicle." *Id*. (citing *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008)). The duration of the stop can be as long as reasonably necessary to issue a citation, conduct a criminal history search, and conduct a routine investigation. *Payne*, 534 F.3d at 951. A traffic stop, however, can become unlawful if it is longer than necessary. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

Officer Judkins' stop of the Explorer on the evening of January 25, 2011, was objectively reasonable because he observed at least three traffic violations and several suspicious acts. *Stachowiak*, 521 F.3d at 853-55; *Thomas*, 93 F.3d at 485. The duration of the stop was reasonable under the Fourth Amendment. *Prouse*, 440 U.S. at 653. Judkins did not violate Preston's Fourth Amendment rights when he requested to see his identification. *Collier*, 2011 WL 2150223, at *3-*4; *Payne*, 534 F.3d at 951. Judkins conducted a lawful *Terry* stop. *Prouse*, 440 U.S. at 653; *Collier*, 2011 WL 2150223, at *3-*4.

### b. Preston was Lawfully Removed from the Vehicle Incident to a Valid Impound Search.

The absence of valid insurance and a validly licensed driver prompted Officer Judkins to impound the Explorer. Preston does not appear to contest the lawfulness of his removal from the Explorer as part of a valid impound search. This removal, however, led to the pat-down of Preston, which he asserts was unlawful. The Court is required to analyze the objective basis for removing Preston from the Explorer in conjunction with an impound search.

Conducting a road-side inventory search of a to-be-impounded vehicle comports with well-accepted police department procedures that have been repeatedly held to be lawful. *See, e.g.*, *United States v. Rowland*, 341 F.3d 774, 776 (8th Cir. 2003); *United States v. Edwards*, 563 F. Supp. 2d 977, 988-89 (D. Minn. 2008); *United States v. Waldron*, No. 07-50025, 2007 WL 2080520, *2 (D.S.D. Jul. 17, 2007). Road-side inventory searches are justified if an officer

reasonably suspects that possession of or driving a vehicle is unlawful. *Rowland*, 341 F.3d at 776.

Ordering all of the occupants of an impounded vehicle to exit the vehicle is constitutionally

permissible for officer safety reasons. *Edwards*, 563 F. Supp. 2d at 1000-01.  Passengers do not

have a reasonable expectation of privacy in a vehicle in which they are a passenger, yet they do

have a reasonable expectation of privacy in their person. *See United States v. Green*, 275 F.3d

694, 699 (8th Cir. 2001).

Here, Preston was required to exit the Explorer after back-up officers arrived because the

Explorer was going to be impounded for lack of insurance and lawful driver.  As a matter of

course, police must remove the occupants of a vehicle in order to search the vehicle. *Edwards*,

563 F.Supp.2d at 1000-01.  In this case, such a search was necessary to ensure that the vehicle

could be safely removed. *Id*.  These safety concerns were justified in light of the initial

uncertainty as to whether the Explorer was stolen, Smith's odd behavior, and Officer Judkins'

suspicions that Preston might be in possession of a firearm. *Rowland*, 341 F.3d at 776.  There

existed an objectively reasonable basis for removing Preston from the vehicle.  This conduct did

not violate Preston's Fourth Amendment rights; the squad video shows that, contrary to Preston's

assertion, he was not "forcibly" removed from the car. (Def.'s Ex. 2); [Doc. No. 41, at 5].

Preston does not have standing to challenge the search of the vehicle, but he does have

standing to challenge the search of his person because the firearm at issue in this Motion to

Suppress was discovered on Preston's person. *Green*, 275 F.3d at 699.  Next, the Court must

determine whether the protective search of Preston after he was removed from the Explorer was

lawful.

### c.   Officer Barze's Protective Search of Preston was Lawful

Preston argues that it was not objectively reasonable for Officer Barze to search him

because Preston was not engaged in any observable unlawful activity at the time of the stop and

that reputation alone is insufficient to give rise to reasonable suspicion.  The Court disagrees.  In the totality of the circumstances, the protective search of Preston was conducted out of a specific and articulable concern for officer safety.

It is well-settled that "where a police officer observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot and that the persons which whom he is dealing may be armed and presently dangerous" he may conduct a "stop and frisk."  *Terry*, 392 U.S. at 30.  Investigative pat-downs are "especially fraught with dangers to police officers." *Michigan v. Lang*, 463 U.S. 1032, 1047-49 (1983).  Determining the level of danger to an officer is based not upon the officer's subjective knowledge but an objective standard that asks "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  *Terry*, 392 U.S. at 27; *United States v. Horton*, 611 F.3d 936, 941 (8th Cir. 2010).  "The officer need not be absolutely certain that the individual is armed. . . ." *Id.*

The objective reasonable suspicion standard is evaluated in the totality of the circumstances that takes the officer's experience into account.  *Shafer*, 608 F.3d at 1062.  It is well-settled law that an officer conducting a *Terry* pat-down involving individuals with known criminal backgrounds that do not have valid drivers' licenses or insurance was justified for officer safety reasons.  *See*, *e.g*., *Collier*, 2011 WL 2150223, at *3-*4; *United States v. Garcia*, 441 F.3d 596, 598 (8th Cir. 2006); *United States v. Shranklen*, 315 F.3d 959, 963 (8th Cir. 2003).

A recent Eighth Circuit decision, *United States v. Collier*, No. 10-3144, 2011 WL 2150223 (8th Cir. 2011), illustrates the lawfulness of a protective search under circumstances similar to the instant case.  In *Collier*, the officer observed a vehicle parked in a gas station parking lot.  *Id*. at *1.  After running the license plate number, he discovered that the vehicle was associated with a male suspect with an outstanding warrant.  *Id*.  Upon approaching the car, the officer observed a

23

man in the passenger seat making furtive gestures. *Id*. The officer immediately recognized the man as someone he arrested previously for a narcotics violation. *Id*. The officer testified that based on his experience, narcotics are often associated with weapons. *Id*. at * 2. The officer called for back-up. *Id*. After the officer ran the information for both of the vehicle's occupants through the computer system in his squad car, he determined that neither had an arrest warrant. *Id*. After back-up arrived, the officer asked the man to exit the car and put his hands on his head, at which point a pistol and a sixteen-round magazine fell out of the suspect's pants. *Id*. The officer continued the pat-down of the defendant and discovered five grams of marijuana. *Id*.

In a *per curiam* opinion, the Eighth Circuit held that the pat-down in *Collier* was justified in light of the following circumstances: the stop 1) occurred at night, 2) involved an investigation into an outstanding warrant, 3) entailed "surreptitious actions by [a] passenger," and 4) involved an officer recognizing the suspect as associated with narcotics possession. 2011 WL 2150223, at *3-*4. The Eighth Circuit limited the search to the officer's investigation as to whether the defendant posed a threat to officer safety after the officer discovered that the individual named in the warrant was not present. *Id*.

The facts in this case are significantly similar to *Collier*, which supports the conclusion that Officers Judkins and Barze had sufficient objective reasonable suspicion to stop and pat-down Preston in the totality of the circumstances. As in *Collier*, the stop here occurred at night (approximately 10:20 p.m.). 2011 WL 2150223, at *1. Though the facts here did not involve an outstanding warrant, the officers involved clearly and repeatedly expressed the specific safety concerns that led to the pat-down of Preston. Officer Judkins, like the officer in *Collier*, reasonably suspected unlawful conduct was afoot and observed a vehicle passenger engaging in

suspicious conduct.[22]  *See Terry*, 392 U.S. at 30.  Officer safety concerns need not be limited to situations involving a passenger actually engaging in the suspicious conduct, especially given that "the fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer."  *Maryland v. Wilson*, 519 U.S. 408, 413 (1997).

Finally, and most significantly, upon reading Preston's name on his identification, Judkins recognized Preston as someone known to possess weapons.  In comparison with the officer in *Collier* who recognized the defendant as someone merely associated with narcotics, the connection between Preston and possession of a weapon is stronger than was the link between the defendant's motion and weapons in *Collier*.  *Id*. at *2.  Officer Judkins' statements on the squad car video clearly demonstrate his knowledge of Preston's history of weapons possession.[23]  (Def.'s Ex. 2).  Moreover, Judkins' statements over the radio to the responding officers that one of the passengers in the Explorer was "known to carry weapons" further substantiates the officer safety concerns that led to the search of Preston.  (Def.'s Ex. 2 at 23:08:44)  *See Collier*, 2011 WL 2150223, at *3-*4; *Garcia*, 441 F.3d at 598; *Shranklen*, 315 F.3d at 963.  At least eight times at the evidentiary hearing, Officers Judkins and Barze made direct reference to officer safety and

---

[22] The Court notes, however, that in *Collier*, the defendant engaged in movements that suggested that he may be concealing a weapon, whereas in the instant case, Preston was not observed to be attempting to hide anything.  2011 WL 2150223, at *1.  Yet, there were sufficient facts supporting reasonable suspicion to justify a protective search based on erratic driving, Smith's furtive conduct and lack of drivers' license or insurance.  Such facts, in the totality of the circumstances, would lead a reasonably prudent officer to conduct a protective search of Preston and the other individuals in the car.  *United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002).

[23] Preston relies on *United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008), to question the freshness and directness of Officer Judkins' knowledge of Preston's criminal past based on three incidents several years prior and roll call safety briefings.  As the Eighth Circuit pointed out, "[t]here is no bright-line test for determining whether information is stale" in the context of an officer's knowledge of a suspect's reputation for carrying firearms or drugs.  *Id*. (citing *United States v. Koelling,* 992 F.2d 817, 822 (8th Cir. 1993)).  *Stachowiak* does not, however, preclude subsequent cases, such as *Collier*, from establishing sufficient reasonable suspicion based on clearly articulated officer safety concerns even in the absence of information from a confidential informant of furtive suspect conduct.  *See* 2011 WL 2150223, at *3-4.

concerns that Preston may have been in possession of a weapon.  (Tr. 38, 42-46, 90, and 101). The squad car video verifies Officer Judkins' testimony regarding Preston's reputation for carrying weapons when Judkins described Preston as "know to carry weapons" twice before Preston was removed from the vehicle and searched.[24] (Def.'s Ex. 2 at 23:08:44; 23:09:32).  These statements meet the definition of specific and articulable suspicion necessary to support a constitutional pat-down. *Terry*, 392 U.S. 1, 21-22.  And, these explicit statements provide ample support for the proposition that the officers reasonably believed that Preston may have been in possession of a firearm and were concerned for their safety.  *See Collier*, 2011 WL 2150223, at *3-*4; *Garcia*, 441 F.3d at 598; *Shranklen*, 315 F.3d at 963.

Though Preston was cooperative, this does not eliminate the officer safety concerns Officers Judkins and Barze faced.  *Id.* at 856-57.  A passenger who is initially cooperative can easily become threatening without notice, especially in situations where an officer's attention is focused on the driver.  *Wilson*, 519 U.S. at 413.  Thus, it was objectively reasonable for Officer Barze to pat-down Preston for weapons to ensure his safety and the safety of his fellow officers. *See Roggeman*, 279 F.3d at 578.  For these reasons, the pat-down of Preston did not violate his Fourth Amendment rights and the weapon recovered from the search not be suppressed.

---

[24] Preston cites *United States v. Sandoval*, 29 F.3d 537, 542 for the proposition that a suspect's reputation for weapons possession alone is insufficient to lead to a pat-down.  While the court agrees that knowledge of a person's past criminal history "is alone insufficient to give rise to the requisite reasonable suspicion," several other facts supported reasonable suspicion in the totality of the circumstances in this case.  *Id.* (internal citations omitted).  Judkins' observation of Smith's odd behavior, coupled with Judkins' past knowledge of Preston's history of firearm possession in the totality of the circumstances was sufficient to support a pat-down under *Terry* and its progeny. *See Horton*, 611 F.3d at 941; *Maltais*, 403 F.3d at 554; *Shafer*, 608 F.3d at 1062.

**2.  Motion to Suppress Statements Made to Officers at the Scene Should be Denied.**

Preston seeks to suppress statements that he made to officers at the scene as fruits of an illegal search.  (Tr. 103-104).  In his post-hearing brief, Preston does not articulate the basis for his motion to suppress statements [Doc. No. 41].  Based on the foregoing analysis, the Court has determined that the stop of Preston was lawful.  For completeness, the Court will briefly analyze under *Miranda* the statements Preston made to officers at the scene and the statements Preston made to Agent Freeman on January 26, 2011 and January 27, 2011.

**a.  Preston's Statements to Officers at the Scene Were Voluntary.**

Preston's Motion to Suppress seeks to prevent the admission of un-*Mirandized* statements Preston made following the pat-down. [Doc. No. 23, at 2].  A statement does not need to be suppressed as "fruit of the poisonous tree" under *Wong Sun v. United States,* 371 U.S. 471, 488-89 (1963), when the initial *Terry* stop is supported by reasonable, articulable suspicion.  *United States v. Martinez*, 462 F.3d 903, 910 (8th Cir. 2006).  During a typical *Terry* stop, an officer may ask the individual "a moderate number of questions" to determine the person's identity and to confirm or deny the officer's suspicions.  *United States v. Gilliam*, 520 F.3d 844, 847 (8th Cir. 2008); *United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001).  Limited questioning of an individual about the possession of a weapon during a *Terry* stop does not require a *Miranda* warning.  *United States v. Boucher*, 909 F.2d 1170, 1174 (8th Cir. 1990) (citing *United States v. Harris*, 611 F.2d 170, 173 (6th Cir. 1979) (questioning of suspect in his hotel room as to whether he had a weapon did not require *Miranda* warnings)).

Because the length of the stop was minimal and the officers did not use unreasonable force, Preston's initial detention was a *Terry* stop.  The limited questions Officer Barze asked Preston regarding the firearm did not require a *Miranda* warning in the context of a valid *Terry* stop.

27

*Boucher*, 909 F.2d at 1174; *Harris*, 611 F.2d at 173.  Accordingly, these statements need not be suppressed.

> **b.   Preston Was Properly Given Miranda Warnings Before Making Statements to Agent Freeman on January 26, 2011 and January 27, 2011.**

Generally, a law enforcement officer must advise a person of his *Miranda* rights before interrogating a suspect in a custodial setting.  *Miranda v. Arizona,* 384 U.S. 436, 444 (1966); *Illinois v. Perkins*, 496 U.S. 292, 297 (1992).   *Miranda* defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *United States v. Hogan*, 539 F.3d 916, 921 (8th Cir. 2008) (citing *Miranda,* 384 U.S. at 444).   An interrogation includes either express questioning or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response.  *Id.*; *United States v. Howard*, 532 F.3d 755, 762 (8th Cir. 2008); *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007).

Despite Preston's assertion at the motions hearing that he was not properly *Mirandized*, the record of the custodial interview demonstrate that Agent Freeman did, in fact, fully *Mirandize* Preston.  (Gov't Exs. 2, 3).  Both transcripts reflect the fact that Agent Freeman read Preston's *Miranda* rights individually and that Preston did not respond in the negative or ask that the questioning cease at any time.  *Id*.  Based on Agent Freeman's hearing testimony, the Court concludes that neither interview occurred in a coercive environment and that Preston spoke with Agent Freeman voluntarily after receiving two valid sets of *Miranda* warnings.  As such, Preston's statements in these interviews need not be suppressed.

## V.  RECOMMENDATION

Based on the foregoing, all the files and records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.  Defendant's Motion to Dismiss for Speedy Trial Act Violation [Doc. No. 16] be **DENIED**

    and

2.  Defendant's Motion to Suppress [Doc. No. 23] be **DENIED**.

Dated: June 8, 2011

s/ Steven E. Rau_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **June 15, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.